## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **JANUS ELAINE SLITER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:24-cv-00257-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Frank Bisignano,[1]* | ) | |
| *Commissioner of Social Security*, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>OPINION AND ORDER</u>

Plaintiff Janus Elaine Sliter appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB"). (ECF 1 at 2).[2] Sliter filed her opening brief on November 14, 2024, and the Commissioner timely responded on February 18, 2025. (ECF 11, 17). Sliter, however, failed to file a reply brief, and her time to do so has now passed. (*See* ECF 15). Therefore, the appeal is ripe for ruling. For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. FACTUAL AND PROCEDURAL HISTORY

Sliter applied for DIB in August 2022, alleging disability as of August 12, 2022, however she subsequently amended the disability date to April 10, 2023. (ECF 4 Administrative Record

---

[1] Frank Bisignano became the Commissioner of Social Security in May 2025, and thus, pursuant to Federal Rule of Civil Procedure 25(d), he is automatically substituted for his predecessor as the defendant in this suit. *See La-Toya R. v. Bisignano*, No. 1:24-cv-01564-JMS-TAB, 2025 WL 1413807, at n.2 (S.D. Ind. May 15, 2025).

[2] The parties have consented to the exercise of jurisdiction by a Magistrate Judge. (ECF 19, 20).

("AR") 46, 167; *see* AR 15).[3] Sliter's claim was denied initially and upon reconsideration. (AR 91-100). On October 12, 2023, administrative law judge ("ALJ") Teresa Kroenecke conducted an administrative hearing at which Sliter—who was represented by counsel—and a vocational expert ("VE"), testified. (AR 41-76). On December 5, 2023, the ALJ rendered an unfavorable decision to Sliter, concluding that she was not disabled because, despite the limitations caused by her impairments, she could perform her past relevant work, along with other unskilled, light-exertional jobs that exist in significant numbers in the national economy. (AR 15-25). The Appeals Council denied Sliter's request for review on April 22, 2024 (AR 5-8), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

On June 25, 2024, Sliter filed a complaint with this Court seeking relief from the Commissioner's decision. (ECF 1). In her appeal, Sliter alleges that a remand is necessary because the ALJ: (1) ignored the findings that supported Sliter's approval of disability benefits under Listing 4.02; (2) failed to account for all of Sliter's physical limitations in the RFC analysis, including her limited tolerance for sitting, standing, walking, lifting, and carrying;[4] and (3) failed to elicit specific testimony from the VE as to the source of the VE's job numbers, as well as the methodology the VE used in her analysis so as to determine whether her methodology was reliable and supported by substantial evidence. (ECF 11 at 3-7).

At the time of the ALJ's December 5, 2023, decision, Sliter was 49 years old (AR 23); had a limited education (AR 24); and had past relevant work as a credit clerk (AR 22-23). In her

---

[3] Sliter amended her disability onset date during her hearing with the ALJ. (AR 46).

[4] Relatedly, Sliter argues that the ALJ failed to identify her overall ability to stand and walk during an 8-hour work day, "which is crucial in determining whether she truly falls into the light RFC level, or if she should be further reduced to the sedentary RFC level . . . ." (*Id.* at 6).

application, Sliter alleged disability due to congestive heart failure,[5] a rare heart disease, and severe scoliosis. (AR 200).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (collecting cases). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, [the Court] must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

---

[5] Though Sliter calls the condition "connective heart failure[,]" the overall record indicates the condition is congestive heart failure. (AR 200*; see, e.g.*, AR 79, 284, 780).

### III. Analysis

*A. The Law*

Under the Act, a claimant seeking DIB must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id*. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently employed in substantial gainful activity, (2) whether she has a severe impairment, (3) whether her impairment is one that the Commissioner considers conclusively disabling, (4) whether she is incapable of performing her past relevant work, and (5) whether she is incapable of performing any work in the national economy. *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1520.[6] "[A]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled." *Zurawski v. Halte*r, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). "A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id*. (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *See Clifford*, 227 F.3d at 868.

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks she can do despite her limitations. 20 C.F.R § 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, work the claimant can complete. *Id*. § 404.1520(e).

*B. The Commissioner's Final Decision*

In the ALJ's December 5, 2023, decision, which became the final decision of the Commissioner, the ALJ observed at the outset that Sliter was insured for DIB through December 31, 2026. (AR 17).[7] At step one of the five-step analysis, the ALJ noted that Sliter did not engage in substantial gainful activity since her alleged onset date of April 10, 2023. (*Id*.). At step two, the ALJ found that Sliter had the following severe impairments: anomalous left coronary artery from the pulmonary artery ("ALCAPA") status post coronary artery bypass graft, hypertension, and scoliosis. (AR 17). At step three, the ALJ concluded that Sliter did not have an impairment or combination of impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 18-19).

The ALJ assigned the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally stoop, kneel, crouch, crawl and climb ramps and stairs. She cannot climb ladders, ropes or scaffolds. The claimant can have no exposure to extreme heat, cold, vibrations, or hazards, such as unprotected heights or dangerous machinery. The claimant should be allowed to alternate into sitting position from the standing and/or walking positions every 30-45 minutes for 2-3 minutes while at the work station and [be] allow[ed] to alternate into the standing position [from] sitting position every 30-45 minutes for 2-3 minutes while at the work station.

(AR 19).

The ALJ determined at step four that, given the foregoing RFC, Sliter could perform past relevant work as a credit clerk. (AR 22-23). Moreover, the ALJ also found that, in the alternative at step five, Sliter could perform a significant number of unskilled, light-exertional jobs in the

---

[7] For purposes of her DIB claim, Sliter must establish that she was disabled on or before her date last insured, December 31, 2026. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that she was disabled as of her date last insured in order to recover DIB).

national economy, including, marker, router, and mail clerk. (AR 23-24). Therefore, Sliter's application for DIB was denied. (AR 24-25).

*C. Impairment or Combination of Impairments*

Sliter's arguments on appeal are that the ALJ erred when she ignored the findings that supported Sliter's approval of disability benefits under Listing 4.02 (chronic heart failure) and failed to account for all of Sliter's physical limitations in the RFC analysis, including her limited tolerance for sitting, standing, walking, lifting, and carrying. (ECF 11 at 4-6). She also contends that the ALJ erred at step five by failing to account for all of Sliter's physical limitations and failing to elicit specific testimony from the VE. (*Id.* at 6-7). Each of these arguments will be addressed in turn.

"Under a theory of presumptive disability, a claimant is eligible for benefits if she has an impairment that meets or equals an impairment found in the Listing of Impairments." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1). Although "[t]he listings specify the criteria for impairments that are considered presumptively disabling[,] . . . . [a] claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing." *Id.* (citation omitted). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Id.* (collecting cases).

That said, "[a]n ALJ need not address every piece of evidence or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024) (citations omitted). Rather, an ALJ is "subject to only the most minimal of articulation requirements." *Id*.

All that is required is that the ALJ "provide an explanation for how the evidence leads to their conclusions that is sufficient to allow . . . a reviewing court[] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Id.* (citations and internal quotation marks omitted).

      1.  <u>Chronic Heart Failure: Listing 4.02</u>

Sliter argues that she has a very rare heart condition, ALCAPA, which causes her "fatigue, shortness of breath . . . limiting walking and exercise tolerance, and avoidance of heavy lifting." (ECF 11 at 4). From her perspective the medical record was not allotted the necessary attention in the ALJ's decision, but rather, the ALJ "chose to solely focus on an echo report that showed Sliter's left ventricular ejection fraction to be fifty to fifty-five percent . . . ." (*Id*. at 5 (citing AR 1143-1144)).[8] This is simply not the case. Contrarily, the ALJ addressed Sliter's ALCAPA condition, recognizing "semi-emergent instances of hypertensive urgency and shortness of breath and chest pain in December of 2021 . . . and January 2022 . . . which noted the claimant's ejection fraction to be 30%." (AR 20 (citing AR 260, 357)). ALJ Kroenecke commented on the above-mentioned findings from medical providers but found Sliter's testimony regarding shortness of breath and chest pain from her heart impairment to be unsupported by her "post-surgery treatment records." (AR 20-21). The ALJ referenced an August 2022 ligation circumflex and coronary artery bypass graft (CABG) surgery, followed by a medical report stating that Sliter "was feeling great. She denied any chest pain or shortness of breath and her energy had improved significantly." (AR 21 (citing AR 596)).

---

[8] Sliter cites to medical evidence in the record in support of her ALCAPA diagnosis, including a cardiac catherization report performed on January 24, 2022, a transthoracic echocardiogram report on December 20, 2021—revealing she had a left ventricular ejection fraction of 30%—and a subsequent echocardiogram performed on August 12, 2022, demonstrating her left ventricular ejection was 35%. (*See* ECF 11 at 5; *see also* AR 248, 255-56, 702).

Additionally, as Sliter points out in her brief, the ALJ referenced a February 2023 physician's note that found her "echocardiograms showed an improved ejection fraction of 55%." (*Id.* (citing AR 1002)). Her "blood pressure was noted as controlled." (*Id.* (citing AR 1005)). Considering Sliter's post-surgery progress, "[t]he ALJ here provided a more than sufficient explanation for why the medical record led her to deny [Sliter's] claim." *Warnell*, 97 F.4th at 1054. The ALJ made a reasonable assessment of Sliter's chronic heart failure, in the context of her ability to perform work, relying on medical evidence from multiple years to conclude that Sliter can perform "a light exertional level of work." (AR 21); *see Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) ("[E]ven if reasonable minds could differ concerning whether [Sliter] is disabled, [the Court] must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported." (citation and quotation marks omitted)).

2. The ALJ's RFC Analysis

Next, Sliter contends that her spine is curved at a 45-degree angle and that lumbar x-rays from February 2023 confirmed dextroconvex curvature of her lumbar spine with degenerative changes. (ECF 11 at 5 (citing AR 1140)). As a result Sliter "suffers from constant lower back pain, limiting sitting tolerance, inability to stand or walk for long periods due to weakness[,] and balance issues." (*Id.*). Furthermore, she "presents herself in a slouched forward position[,]" "cannot lay down flat on a bed or couch[,]" and "must frequently use a heating pad in order to attempt to loosen up the stiffness in her spine and relieve the constant pain." (*Id.*). As Sliter sees it, the ALJ "failed to identify Sliter's overall ability to walk during an 8-hour workday which is crucial in determining whether she truly falls into the light RFC level, or if she should be further reduced to the sedentary RFC level [because] she has a limited tolerance for standing and walking  . . . ." (*Id.* at 6). Moreover, Sliter avers that "she does not possess the stamina or ability

to perform her past relevant work as a credit clerk or any other work in the national economy based on the combination of her severe conditions and resultant limitations." (*Id.*)*.* Relevant to Sliter's back-related claims, the ALJ concluded that "[t]he claimant should be allowed to alternate into sitting position from the standing and/or walking positions every 30-45 minutes for 2-3 minutes while at the work station and allow[ed] to alternate into the standing position form sitting position every 30-45 minutes for 2-3 minutes while at the work station." (AR 19).

To the extent Sliter's argument is meant to undermine the sufficiency of the ALJ's RFC assessment, it fails. "When a claimant's impairments require switching between positions during a workday, '[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.'" *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020) (alteration in original) (citing SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996) (finding an ALJ's RFC, requiring the claimant "to change positions as needed, while remaining in each position at least 30 minutes[,]" to be sufficiently clear). Here, the ALJ's RFC assessment is also satisfactory. This case is unlike "*Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012), in which the ALJ stated simply that the claimant needed to alternate between sitting and standing 'throughout the workday.'" *Prater*, 947 F.3d at 481-82. ALJ Kroeneke sufficiently elaborated on the intervals in which Sliter should change positions from standing to sitting, and the Court will not "strain[] to read into the RFC formulation ambiguity that is not there." *Id.* at 481.

Relatedly, the ALJ relied on medical evidence from the record in formulating her assessment. (*See* AR 22; *see also* AR 81, 88). Specifically, the ALJ found persuasive the opinions of Shayne Small, M.D., and M. Brill, M.D., two State agency physicians who reviewed Sliter's medical record in February and May 2011, respectively (*see* AR 78-81, 85-90), as they "are acceptable medical sources with knowledge of[,] and experience with[,] the social security

benefits programs [who] had the opportunity to independently and thoroughly review the records

before them . . . ." (AR 22); *see Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir.

2004) ("It is appropriate for an ALJ to rely on the opinions of physicians . . . who are also

experts in social security disability evaluation." (citation omitted)). In February and May 2023

Dr. Small and Dr. Brill, respectively, found that in an 8-hour workday, Sliter could stand or walk

for 6 hours, and sit for 6 hours. (AR 81, 88).[9] Further, the ALJ relied on Sliter's own testimony

that she could "make it for 30 minutes before she needs a break, with sitting, standing or

walking." (AR 20; *see* AR 57-58). Taking these observations in sum, the ALJ's RFC assessment

pertaining to Sliter's back-related impairments is supported by substantial evidence.

Accordingly, the ALJ's findings regarding Sliter's back-related conditions will not be

disturbed.[10]

### *D. VE Testimony*

Sliter's last arguments pertain to step five of the evaluation process. Sliter contends the

"ALJ committed a reversible error by failing to elicit specific testimony from the VE as to the

source of her job numbers, as well as the methodology she used in her analysis so as to

determine whether said methodology was reliable and supported by substantial evidence." (ECF

11 at 7).[11] "[A] vocational expert's job-number testimony will survive review under the

---

[9] The Court notes that the standing and sitting restrictions, involving 30–45-minute interval changes, require less sitting and standing than 6 hours in an 8-hour workday—thus providing Sliter more flexibility to sit or stand than Dr. Small and Dr. Brill recommended. (*See* AR 81, 88).

[10] Sliter's argument that restrictions of lifting and carrying should have been included in the RFC is underdeveloped, as this averment is only summarily mentioned in Sliter's brief and the record does not appear to support such a designation. *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018) (waiving perfunctory and underdeveloped arguments).

[11] To this point, Sliter attempts to undermine the reliability of the Dictionary of Occupational Titles (the "DOT"), claiming it "is an outdated and somewhat obsolete source of information that has not been updated since 1977." (*Id*.). Sliter's contention with the DOT is noted. *See Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020) ("Because the [DOT's] database of job titles is so outdated, an expert's methodology for connecting job titles to reliable estimates of the number of jobs for each title is especially important. The Social Security Administration has itself

substantial-evidence standard as long as it rests on a well-accepted methodology and the expert

describes the methodology 'cogently and thoroughly.'" *Brace*, 970 F.3d at 822 (citing *Biestek v.*

*Berryhill*, 587 U.S. 97, 105 (2019)). The Seventh Circuit Court of Appeals has found a VE's

testimony "neither cogent nor thorough" and "indeed, . . . unintelligible" where the VE's

explanation of his methodology was as follows:

> Well, it's—it's that combination of, one, you are looking at the number of
> titles that are in that category[,] and then based upon the—my information
> that I have as far as how the frequency of those jobs are performed, then we
> do an allocation based upon weighting or re-weighting those allocations to
> get the estimates of the numbers. So you look at that particular job title and
> how it is weighted to the total number of jobs that [are] in that OES category
> to make an estimate. And all these are estimates because ... there is no specific
> calculation.

*Id*. at 821-22 (alterations in original).

    Yet, the Seventh Circuit Court of Appeals has found a VE's testimony to be credible

where, during cross-examination, he "stated that he calculated his estimates from numbers

published by the U.S. Bureau of Labor Statistics . . . . [and] explained that "[t]he Bureau [does]

not provide job numbers on individual . . . occupations' and instead "combine[s] several

occupations in a grouping." *Fetting v. Kijakazi*, 62 F.4th 332, 335-36 (7th Cir. 2023) (second,

third, and fourth alterations in original). In doing so, the court noted that the plaintiff's attorney

"did not challenge the VE's methodology for estimating the prevalence of jobs in the national

economy or make any specific objections to the VE's job number testimony." *Id.* at 337; *see also*

---

acknowledged this issue and expressed an intent to update the database, but the new version has not yet arrived."
(citation omitted)). But despite this, "[v]ocational experts frequently rely on the . . . DOT job classification system
because the Social Security Administration regulations authorize the agency to take administrative notice of reliable
job information from the DOT." *Case v. Kijakazi*, No. 22-2379, 2023 WL 4882880, at *1 n.1 (7th Cir. Aug. 1, 2023)
(citing 20 C.F.R. § 404.1566(d)(1)); *see also Milhem v. Kijakazi*, 52 F.4th 688, 694 (7th Cir. 2022) ("ALJs often rely
heavily on two sources of occupational information to determine whether the government has met its burden; the
*DOT* and Vocational Experts." (citation omitted); *see generally Schmitz v. Colvin*, 124 F.4th 1029 (7th Cir. 2024)
(relying in part on an ALJ's use of the DOT in finding that the ALJ's decision was supported by substantial
evidence).

*id.* at 338 ("A claimant who fails to object at the hearing forfeits any challenge to the VE's testimony."); *Leisgang v. Kijakazi*, 72 F.4th 216, 220-21 (7th Cir. 2023) ("[Plaintiff] . . . had to object or otherwise indicate that the VE's methodology was unreliable in order to flesh out and preserve the issue for our review. He failed to do so. Instead, he posed only a few general questions to the VE, none of them hinting the VE's methodology might be problematic . . . . Consistent with *Fetting*, [Plaintiff] cannot start questioning the VE's estimates now.").

Here, the VE testified that Sliter could perform several jobs, including the role of a marker, router, and mail clerk. (AR 72). The testimony in this case was not akin to the "unintelligible" testimony found in *Brace*, 970 F.3d at 821-822. And salient to the Court's ruling in this case, while Sliter's attorney did briefly cross-examine the VE about the job numbers and the VE's sources at the hearing, Sliter did not advance a specific objection to the VE's methodology or job numbers, either during the administrative hearing or in a post-hearing brief. *See, e.g., Leisgang*, 72 F.4th 220-21 ("When the ALJ eventually cut off a different line of questioning directed to the VE, [Plaintiff] did not register an objection for the record before moving on."). For clarity, the line of questioning during Sliter's cross-examination of the VE proceeded as follows:

> Q. Okay. And as far as the source of the job and the job numbers you identified in the earlier hypotheticals, can you identify that for us?
>
> A. Yes. I used generally published information, and I often use SkillTRAN, Job Browser Pro. And I look at the specific DOTs, and then I look at the Occupational Employment Survey [INAUDIBLE]. I review the DOTS, make sure they're all current jobs in the labor market; and then I look at, again, the numbers from the Bureau of Labor Statistics and ORS, and that's how I come up with my numbers for employment.
>
> Q. Very good. Those jobs and those job numbers, does it break them down per geographic region, or just gives you kind of an overall national number?
>
> A. They're national numbers.

Q. Okay, And is there any breakdown between the number of these jobs being full-time versus part-time, or again, just give you a general number?

A. No, these are full-time jobs.

ATTY: Okay. All right. Thank you, Ms. Giedeman. Thank you, Judge.

(AR 74-75).

The Court does not intimate that the VE's explanation is a quintessential best-practice of VE job number-estimate analysis, but that is not the Court's goalpost here. *See Case v. Kijakazi*, No. 22-2379, 2023 WL 4882880, at *3 (7th Cir. Aug. 1, 2023) ("The inability of the vocational expert to precisely explain [SkillTRAN's] algorithms does not render his explanation unreliable." (citation omitted)).[12] Rather, "nothing about the VE's testimony in this case indicated, by itself, that the ALJ could not put some 'modicum of confidence' in the VE's job-number estimates. *Leisgang*, 72 F.4th at 220. Indeed, the VE testified that he often uses SkillTRAN, Job Browser Pro, looks at the specific DOTS, and looks at the Occupational Employment Survey ("OES"). (AR 74-75). Though he could have further articulated how he reaches his job estimate numbers, the burden is on Sliter to object to any concerns in the VE's job estimation. *See Fetting*, 62 F.4th at 338 ("This objection must be specific; to avoid forfeiture, a claimant must do more than make a general objection or vaguely ask the VE about his methodology." (collecting cases)).

At any point in the line of three questions that Sliter's counsel posed, a specific objection could have been stated on the record to retain the opportunity for judicial review on this issue. Instead, Sliter engaged in a rather shallow line of inquiry regarding the VE's job number

---

[12] "As we have explained, there is a mismatch between the DOT codes and Occupational Employment Survey (OES) data because they use different classification schemes. Accordingly, vocational experts must employ some analytical method to match DOT job categories with OES data on job prevalence." *Id*. (internal citation omitted).

analysis, including the geographic makeup of those numbers and the "full-time versus part-time" breakdown of the VE's analysis. (AR 75). In lieu of objecting during cross-examination, Sliter's attorney made statements such as "[v]ery good" and "[o]kay. All right. Thank you, Ms. Giedman." (*Id.*). These are certainly not objections, and do not "indicate that [Sliter's attorney] believed the methodology was unreliable." *Fetting*, 62 F.4th at 338.

But perhaps most critical to the Court's decision is the fact that the ALJ found at step four that Sliter could perform her past relevant work as a credit clerk. (AR 22-23). Even though the VE's testimony here is not a model of perfection, the Court has already determined that the ALJ's step-four decision is supported by substantial evidence, and thus, the ALJ's step-five finding is not outcome-determinative. Consequently, Sliter's challenge to the VE's testimony is unavailing. The decision of the Commissioner will be AFFIRMED.

SO ORDERED.

Entered this 12th day of June 2025.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge